**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Miriam Duran for J. D., | : | Case No. 1:10-cv-0579 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her son's claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act), 42 U. S. C. §§ 1381 *et seq*. Pending are the parties' brief on the merits (Docket No. 14 & 20). For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

**I. PROCEDURAL BACKGROUND**

Plaintiff filed an application for SSI on January 10, 2007, alleging that her son, JD, became disabled on October 1, 2005. Plaintiff's request for SSI benefits was denied initially and upon reconsideration (Docket No. 11-2, p. 9 of 21). Plaintiff and JD, represented by counsel, Marcia Margolius, appeared before Administrative Law Judge (ALJ) Dennis James LeBlanc, who rendered

an unfavorable decision on October 23, 2009 (Docket 11-2, p. 21 of 21). The Appeals Council denied Plaintiff's request for review on February 4, 2010 (Docket 11-2, pp. 2-4 of 21). Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II. FACTUAL BACKGROUND

### A.   JD'S TESTIMONY

JD testified that he was 12 years of age. He received special education services which included more individualized attention from teachers in mainstream eighth grade classes. JD acknowledged that he had been held back in the third grade (Docket No. 11 Exhibit 3, pp. 6-8 of 37). In fact, he had been suspended from a school because he was "loud with the teacher." JD expressed that he had difficulty with math and reading, but enjoyed playing video games, reading "car magazines," cycling, watching television and playing sports with friends and siblings. He used computers and the internet for simple things such as electronic mail and MySpace (Docket No. 11 Exhibit 3, pp. 7-12, 13, 14, 16 of 37). JD explained that he had difficulty doing what his friends could do (Docket No. 11, Exhibit 3, p. 17 of 37).

### B.   PLAINTIFF'S TESTIMONY.

Plaintiff Miriam Duran testified that the school modified the grading scale to assist JD with his grades (Docket No. 11, Exhibit 3, p. 19 of 37). JD had difficulty understanding and comprehending. Plaintiff assisted JD with his focus on such tasks as homework or chores. Plaintiff had never been employed due to his age; however, he was able to complete typical chores such as cleaning his room and taking out the trash if given reminders (Docket No. 11 Exhibit 3, pp. 20-21 of 37). Plaintiff claimed that JD had difficulty completing story problems but with due deliberation,

he could complete certain problem solving tasks (Docket No. 11, Exhibit 3, p. 26 of 27). Plaintiff entrusted JD with coins but no currency (Docket No. 11, Exhibit 3, p. 22 of 27).

JD's only physical impairment was asthma and it was controlled by medication (Docket No. 11, Exhibit 3, p. 21 of 37). JD was treated quarterly by a physician for symptoms of Attention Deficit Hyperactivity Disorder (ADHD) (Docket No. 11, Exhibit 3, p. 22 of 37). Plaintiff claimed that JD's obesity resulted in dyspnea; however, she was seeking an award of benefits for unresolved symptoms of ADHD (Docket No. 11 Exhibit 3, p. 21-23 of 37).

### III. EDUCATIONAL RECORDS.

There was an Individualized Education Program (IEP), a plan in which the unique educational needs of a child with a disability is created to help the child succeed in school, effectuated on January 7, 2008, to assist the educators, Plaintiff and JD during the 2008-2009 school year. This IEP suggested that JD would benefit from specialized instruction in a small group. In turn, JD would work to improve number sense, reading process, and reading vocabulary( Docket No. 11, Exhibit 12, pp. 4-6 of 14; ed.gov/parents/needs/special/**iep**guide/index.html).

In September 2008, JD scored 21% on the Cleveland Metropolitan School District (CMSD) math benchmark test, scored within the 25th percentile on the CMSD reading benchmark test and he failed the Ohio Achievement Test (OAT test) (Docket No. 11, Exhibit 9, p. 31 of 38). JD's kindergarten, first, second and third grade teachers opined that JD's performance was below grade level, and he required special attention during those school years (Docket No. 11, Exhibit 9, pp. 15-21 of 38).

Jennifer Beebe, M. Ed., the school psychologist, administered a battery of tests in 2005,

3

including:

    (1)    the Woodcock-Johnson III Tests of Achievement (WJIII), a set of intelligence tests that measure cognitive skills,

    (2)    the Peabody Individual Achievement Test (PIAT) (revised), an individually administered measure of academic achievement that produces scores in corresponding domains in mathematics, reading recognition, reading comprehension, spelling and general intelligence and

    (3)    the intelligence quotient (IQ) test.

In the WJIII test, JD was able to read at a third grade level, and his writing skills were still limited, but his math skills were grade appropriate. The WJIII results showed that JD continued to maintain grade level skills in mathematics; that JD's writing was limited and he had to be prompted "a lot" in order to produce writing samples; and that JD had made some progress in reading since his last evaluation; however he was reading at an early elementary level (Docket No. 11 Exhibit 13, pp. 12-13 of 19; http//en.wikipedia.org/wiki/Woodcock-Johnson_Tests_of_Cognitive_Abilities).

JD's performance on the PIAT showed documented borderline reading and reading comprehension equivalent to a second grade level. JD earned basic scores in math, science and social studies and a limited score in reading. He took the sixth grade benchmark assessment in September 2007 and his performance was at 38% in both math and language arts (Docket No. 11, Exhibit 13, p. 12 of 19; http://cps.nova.edu/~cpphelp/PIAT.html).

JD's performance on the intelligence test was generally in the low average range. His performance on the nonverbal fluid reasoning resulted in a scaled score that placed him in the high average range. His performance on the verbal knowledge resulted in a scaled score of five which

was significantly below average.  The split between his verbal and nonverbal performances was consistent with a language based on a learning disability (Docket No. 11, Exhibit 13, p. 13 of 19).

The IEP effective during the 2009-2010 school year focused on improving JD's abilities in reading in context, writing, number sense and operations (Docket No. 11, Exhibit 9, pp. 32-34 of 38).  In 2009, JD's sixth grade teacher opined that he did not attend to verbal presentation, he did not have the age appropriate attention span for verbal presentation and he tended to "tune out" portions rather than attend to all of what was said (Docket No. 11 Exhibit 13, p. 9 of 19).  The Cleveland Metropolitan School District test documentation showed that JD had a learning disability that required substantial modification in curriculum and testing (Docket No. 11, Exhibit 17, p. 15 of 21).

As his third and fifth grade teacher, Kathryn Hartman found that JD had a slight problem with acquiring and using information as well as attending to and completing tasks (Docket No. 11, Exhibit 7, pp. 22-23 of 40).  She further opined in a more recent questionnaire that JD had slight problems in acquiring and using information (Docket No. 11, Exhibit 8, p. 3 of 39).

### IV.  SUMMARY OF MEDICAL RECORDS.

In the function report, Plaintiff wrote that JD had a history of asthma, ADHD, a learning disorder, was disrespectful, hyperactive, and had trouble remembering to do multiple things.  It was her opinion that JD had limitations in understanding what he learned and had some issues concentrating on assigned tasks (Docket No. 11, Exhibit 7, pp. 9, 15 of 40).

#### DR. ROBERT NEEDLEMAN, M. D.

Dr. Needlman, a pediatrician, first examined JD on February 3, 2004.  During the course of treatment, he addressed a number of symptoms related to asthma, dyslexia and ADHD (Docket No.

11, Exhibit 18, pp. 18-19 of 24; Docket No. 11, Exhibit 15, p. 19 of 43). He determined that Plaintiff's asthma was a by-product of tonsil issues (Docket No. 11, Exhibit 15, p. 18 of 43). On January 29, 2007, Dr. Needlman found that JD had a learning disorder that required special help in reading, concentration, and short-term memory (Docket No. 11, Exhibit 11, p. 23 of 40). He also noted that stimulant medications improved JD's attention issues, but did not treat learning issues (Docket No. 11, Exhibit 11, p. 24 of 40). On February 3, 2007, Dr. Needlman noted JD's weight was in the 98th percentile and his body mass index was in the 99th percentile (Docket No. 11, Exhibit 11, p. 37 of 40). On August 3, 2007, Anton Freihofner reviewed Dr. Needlman's work and affirmed his assessments (Docket 11, Exhibit 11, p. 40 of 40).

On January 24, 2008, he diagnosed JD with morbid obesity and mild asthma controlled with medication. Later, on January 30, 2008, Dr. Needlman diagnosed JD with marked limitations in attending and completing tasks, acquiring and using information, health and physical well-being and out-of-control obesity (Docket No. 11, Exhibit 15, pp. 14-16 of 43).

In the Health Care Medical and Functional Equivalence Questionnaire dated February 26, 2009, Dr. Needleman found that:

(1) JD had moderate limitations in his ability to acquire and use information;

(2) JD had marked limitations in attending and completing tasks,

(3) JD had moderate limitations in caring for himself brought on by obesity; health; and

(4) marked limitations in his health and physical well-being as evidenced by moderate asthma and severe obesity (Docket No. 11, Exhibit 18, pp. 19-20 of 24).

**MCCAFFERTY FAMILY PRACTICE**

Dr. Douglas P. Van Auken, a family practitioner in the McCafferty Family Practice, examined JD on February 10, 2005 and found that JD's asthma was improving after his tonsillectomy in 2004. He further found that ADHD was being treated with Concerta®, a medication used to treat ADHD (Docket No. 11, Exhibit 11, p. 12 of 40). On January 30, 2007, Dr. Van Auken found JD's weight was increasing rapidly; however, his asthma had stabilized (Docket No. 11, Exhibit 11, p. 10 of 40).

#### STATE AGENCY PHYSICIAN REPORTS

Drs. John Mormol, M. D., and Tonnie Hoyle, Psy. D., found JD's condition to be a severe impairment, but it did not meet the listing of disabilities. At the time of their evaluations, JD was in the fifth grade and he performed his reading, writing and math skills at grade level. His asthma was much better after the tonsillectomy (Docket 11, Exhibit 11, pp. 16-18 of 40).

### V. STANDARD OF DISABILITY.

An individual under the age of 18 shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i) (Thomson Reuters/West 2011). A three-step sequential evaluation process is employed to determine whether an individual under 18 is disabled. 20 C. F. R. § 416.924 (Thomson Reuters 2011). Specifically, the SSA will consider (1) whether the child is working; (2) whether the child has a medically determinable severe impairment which is expected to result in death, has lasted or is expected to last for a continuous period of not less than 12 months and, if so, (3) whether the impairment or combination of impairments meets, medically equals, or functionally equals the

severity of any impairment listed in the listing found at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924 (a), (b), (c), (d) (Thomson Reuters/West 2011).

The SSA will find an impairment functionally equivalent to a Listing if the child has an extreme limitation in one area of functioning, or a marked limitation in two areas of functioning. 20 C.F.R. § 416.926a(b)(2) (Thomson Reuters/West 2011). If the child has a severe impairment or combination of impairments that does not meet or medically equal any listing, SSA will decide whether it results in limitations that functionally equal the listings. 20 C. F. R. § 416.926a (a) (Thomson Reuters 2011). By "functionally equal the listings," SSA means that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section. 20 C. F. R. § 416.926a (Thomson Reuters 2011).

An assessment of the functional limitations caused by the child's impairments will be made, for example, based upon what the child cannot do, what the child has difficulty doing or needs help doing, or are restricted from doing because of his or her impairment(s). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2011). When making a finding regarding functional equivalence, SSA will assess the interactive and cumulative effects of all of the impairments for which there is evidence, including any impairments the child has that are not "severe." (*See* § 416.924(c)). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2011). Assessing functional limitations, SSA will consider all the relevant factors in §§ 416.924a, 416.924b, and 416.929 including, but not limited to:

(1) How well the child can initiate and sustain activities, how much extra help the child needs, and the effects of structured or supportive settings (*see* § 416.924a(b)(5).

(2) How the child functions in school (*see* § 416.924a(b)(7); and

(3) The effects of your medications or other treatment (*see* § 416.924a(b)(9).

SSA will look at the information in the child's case record about how his or her functioning is affected during performance of all activities when deciding whether the impairment or combination of impairments functionally equals the listings. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). The child's activities are everything done at home, at school, and in the community. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). SSA will consider how the child appropriately, effectively, and independently performs activities compared to the performance of other children his or her age who do not have impairments. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). Consideration will be given to how the child functions in activities in terms of six domains. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). The domains are:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;
(iv) Moving about and manipulating objects;
(v) Caring for yourself; and,
(vi) Health and physical well-being.

20 C. F. R. § 416.926a(b) (1) (i), (ii), (iii), (iv), (vi) (Thomson Reuters 2011).

When assessing whether the child can function in each domain, SSA will ask for and consider information that will help answer the following questions about whether the child's impairment(s) affects the child's functioning and whether the activities are typical of other similarly aged children who do not have impairments.

(i) What activities are you able to perform?
(ii) What activities are you not able to perform?
(iii) Which of your activities are limited or restricted compared to other children your age who do not have impairments?
(iv) Where do you have difficulty with your activities-at home, in childcare, at school, or in the community?
(v) Do you have difficulty independently initiating, sustaining, or completing activities?
(vi) What kind of help do you need to do your activities, how much help do you need, and how often do you need it?

9

20 C. F. R. § 416.926a(b)(2)(i), (ii), (iii), (v), (vi) (Thomson Reuters 2011).

SSA will decide that a child's impairment(s) functionally equals the listings if the impairment is of listing-level severity. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2011). The child's impairment(s) is of listing-level severity if he or she has "marked" limitations in two of the domains in paragraph (b)(1) of this section, or an "extreme" limitation in one domain. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2011).

The term "marked" means a limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011). The child's day-to-day functioning may be seriously limited when his or her impairment(s) limits only one activity or when the interactive and cumulative effects of the child's impairment(s) limit several activities. 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011).

"Extreme" limitation means a limitation that is "more than marked." 20 C. F. R. § 416.926a(e)(2)(i) (Thomson Reuters 2011). It does not necessarily mean a total lack or loss of ability to function. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2011). SSA will find that the child has an "extreme" limitation in a domain when his or her impairment(s) interferes very seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C. F. R. § 416.926a(e) (3)(i) (Thomson Reuters 2011). The day-to-day functioning may be very seriously limited when the child's impairment(s) limits only one activity or when the interactive and cumulative effects of his or her impairment(s) limit several activities. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2011).

10

## VI. STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981)

*cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)).  If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

### VII. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1. JD was born on November 27, 1994.  Therefore, he was an adolescent on January 10, 2007, the date the application was filed, and was currently an adolescent (20 C.F.R. 416.926a(g)(2)).
2. JD had not engaged in substantial gainful activity since January 10, 2007, the application date (20 C.F.R. 416.924(b) and 416.971 et seq.).
3. JD had the following severe impairments:  ADHD; asthma; and obesity (20 C.F.R. 416.924(c)).
4. JD did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925, and 416.926).
5. JD did not have an impairment or combination of impairments that functionally equaled the listings (20 C.F.R. 416.924(d) and 416.926a).
6. JD had not been disabled, as defined in the Act, since January 10, 2007, the date the application was filed (20 C.F.R 416.924(a)).

(Docket No. 11, Exhibit 2, pp. 12-20 of 21 ).

### VIII. DISCUSSION.

Plaintiff's argument is twofold.  First, she argues that the Commissioner improperly rejected the opinion of JD's treating pediatrician, Dr. Needlman. Second, Plaintiff  argues that substantial evidence proves that JD suffers from ADHD, dyslexia, asthma, and severe obesity, which cause marked impairments in at least two domains which would equal a functional equivalency and disability.

12

Defendant contends that the court adequately considered the expert testimony and explained the rationale behind its decision thoroughly enough not to require review. Defendant also contends that the ALJ reasonably found that JD's impairments lacked severity to meet a disability finding.

### A. THE TREATING SOURCE OPINION WAS PROPERLY DISCOUNTED.

Plaintiff argues that the ALJ improperly rejected the well-supported opinion of JD's long term treating physician, Dr. Needlman.

To qualify as a treating source, the acceptable medical source must have examined the claimant and engaged in an ongoing treatment relationship with the claimant consistent with accepted medical practices. *McCombs v. Commissioner of Social Security,* 2010 WL 3860574, *6 (S. D. Ohio 2010) (*citing Smith v. Commissioner of Social Security,* 482 F.3d 873, 875 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502)). The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances. *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729-730 (N. D. Ohio 2005).

Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F. R. § 404.1527(d)(2)). In fact, if such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

13

When the treating source does not receive controlling weight, the agency must give good reasons for not affording controlling weight to the treating source's opinion in the context of a disability determination. *Id.* (*citing Wilson*, *supra*, 378 F. 3d at 544). To meet the obligation to give good reasons for discounting the treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.
- Identify evidence supporting such finding.
- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.

Section 404.1527(d) explains that the agency will evaluate every medical opinion and weigh the following factors in deciding what weight to give any medical opinion from a physician in a treatment relationship:
- Nature and extent of the treatment relationship
- Supportability
- Consistency
- Specialization
- Other factor

Plaintiff's arguments that the ALJ fails to explain why Dr. Needleman's opinion was not given controlling weight and that the rationale provided is insufficient to justify the weight accorded to Dr. Needlman's opinion lack merit. Acknowledging the treatment relationship, the ALJ attributed controlling weight to Dr. Needleman's medical opinion as to JD's impulsivity, memory and concentration, poor judgment, and continued learning problems (Docket No. 11, Exhibit 2, p. 15 of 21). Dr. Needlman's opinion was attributed significant weight as it is consistent with the evidence of record. However, the ALJ discounted Dr. Needlman's two reports on JD's functional equivalence as they were inconsistent with each other and not supported by medical signs and laboratory findings. The ALJ articulates in sufficient detail the reasons for the limited weight given Dr. Needlman's opinions in terms of the six functional equivalence domains (Docket No. 11, Exhibit

14

2, p. 15 of 21). The ALJ complied with the regulations that require the factfinder who fails to give a treating physician's opinions controlling weight, to explain the weight given such opinions. The Magistrate must affirm the ALJ's decision to attribute less weight to Dr. Needlman's opinions of functional equivalence domains as such decision is supported by the evidence and the ALJ applied the correct legal standard in assessing Dr. Needlman's opinions.

**B.    THERE WAS SUBSTANTIAL EVIDENCE TO DENY PLAINTIFF'S DISABILITY CLAIM.**

Plaintiff suggests that the ALJ erred in evaluating JD's domains. In particular, Plaintiff argues that there are three domains that co-exist and establish disability.

First, Plaintiff contends that Dr. Needleman's finding that JD performed two standard deviations below is sufficient to establish a limitation on the 'acquiring and using information' domain (Docket No. 11, Exhibit 11, p. 27 of 40). The ALJ found that JD displayed a penchant for technology, utilizing electronic mail, text messaging, maintaining a MySpace account and playing video games online. JD's third and sixth grade teachers suggested that he had **slight** problems with acquiring and using information. Weighing JD's day-to-day school performance, the evidence showed that he succeeded at an average level in other areas of school despite very poor reading scores. JD exceeded standards in social studies, and met several standards in reading and math throughout the year (Docket No. 11, Exhibit 14, p. 2 of 7). Inability to read at grade level was not sufficient to establish a marked limitation in this domain, especially where an IEP was in place and improvements in number sense, reading processes and vocabulary have been noted (Docket No. 11, Exhibit 17, pp. 19-21 of 21). The Magistrate finds that the ALJ did not err in relying on this

evidence to establish that JD did not have a **marked** inability to acquire or use the information acquired.

Plaintiff also contends that the ALJ's finding that JD did not have a marked limitation in the 'attending and completing tasks' domain is erroneous.  The ALJ found that JD was at Waverly School for one week at the time that Ms. Hellwig reported that he had "failed to complete even one assignment" (Docket No. 11, Exhibit 13, pp. 5 & 9 of 19).  Beyond this, the ALJ found that JD could complete his homework with direct assistance and at a slower pace.  JD had no difficulty attending to complex computer activities including navigating online gaming and text messaging (Docket No. 11, Exhibit 2, p. 17 of 21).  The Magistrate does not find that it was error for the ALJ to rely on this evidence in establishing that JD did not have a **marked** limitation in attending and completing tasks.

Lastly, Plaintiff contends that the ALJ disregarded the evidence in the 'health and well-being' domain, and improperly found no marked limitation there.  The ALJ noted that JD was able to maintain his personal hygiene and attend to his personal needs.  He played sports with his friends and his asthma was improving, as evidenced by Dr. Needlman's reports (Docket No. 11, Exhibit 2, p. 20 of 21, Docket No. 11, Exhibit 15, p. 31 of 43).  The Magistrate does not find that the ALJ failed to consider whether JD had a **marked** limitation in this domain.

The ALJ followed the correct legal standards in assessing all of the functional domains as they relate to JD; consequently,  the Magistrate affirms the Commissioner's decision.

## IX. CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date: August 23, 2011.